UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:15CR252 ERW/NCC |
| | ) | |
| LEONARD DALE VAN DAM, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER, MEMORANDUM, AND REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Defendant Leonard Dale Van Dam has filed a Motion To Suppress Evidence (Doc. 55), which was followed by Defendant's Amended Motion To Suppress Evidence (Doc. 71).[1] These motions were prepared with the assistance of appointed counsel. The government responded (Doc. 72). Defendant moved to proceed *pro se* (Doc. 75). The court granted defendant's motion on October 15, 2015, and appointed stand-by counsel.

Thereafter, defendant filed a Motion To Subpoena Witness For the Suppression Hearing Scheduled for 10-23-2015 (Doc. 80); a Motion For The Production Of The Defendant's Prior Record, Documents And/Or Objects Books, Papers, Tangible Objects and Reports, Within The Gov'ts Possession, Custody Or Control Pursuant To F.R.Cr.P. 16(D),(E)(i)(ii), (F)(i)(ii)(iii)

---

[1] At the October 23, 2015 evidentiary hearing, defendant moved to withdraw his Motion To Suppress Evidence (Doc. 55), after explaining that the Amended Motion To Suppress (Doc. 71), raised the same legal issues and corrected several factual mistakes that were contained in the first Motion To Suppress (Doc. 55). The court granted defendant's motion to withdraw.

(Doc. 91); and a Motion For Notice In A Criminal Case Pursuant To FRE 404(b) To Provide Notice Of The General Nature Of Any Evidence The Gov't Intends To Use At Trial (Doc. 92).[2] The government responded (Doc. 100) and (Doc. 104). After the close of the evidentiary hearing, defendant filed a Motion For The Production Of Discovery Pursuant To F.R.Cr.P. 16(a)(1)(A) (Doc. 107); a Petition For Appointment And Furnishment Of An Investigator and Expert Witnesses Pursuant to Title 18 USC § 3006A (Doc. 111); and a post-evidentiary hearing brief in support of his motion to suppress evidence (Doc. 110).

## FACTS

On May 18, 2015, St. Charles County, Missouri Police Officer Casey Boaz was working an early-morning shift with his partner Mark Thomas as they conducted crime patrol along a busy stretch of Interstate 70 in St. Charles County. Officer Boaz, a Missouri peace officer with nearly ten years of experience, is also designated a Task Force Officer with the local Drug Enforcement Administration office. He has conducted thousands of traffic stops in the last three and a half years of his career, which have included many drug interdiction cases and more than 30 large seizures of contraband. Officer Boaz also has specialized training concerning drug interdiction. He testified that he is trained to identify suspicious behavior when he encounters individuals during a traffic stop, including observations about body language, furtive movements and inconsistent stories among vehicle passengers. On cross examination, Officer Boaz testified that he has training to identify clues that would tend to suggest deception when he questions a person.

On May 18, 2015, Officer Boaz situated his patrol vehicle facing southbound near mile marker 204, which is a regular area for him to work because there are two median turnarounds

---

[2] Defendant stated at the evidentiary hearing on October 23, 2015 that his motions (Docs. 91 and 92) did not pertain to the suppression issues.

for emergency vehicles thereabouts. Officer Boaz testified that I-70 is a divided highway at mile marker 204 such that eastbound lanes are physically separated by metal barriers and fencing from the westbound lanes. Officers Boaz and Officer Thomas were driving separate vehicles, although they responded to this incident together for officer safety. Officer Boaz drove a marked police vehicle. Officer Thomas drove an unmarked Chevy Tahoe. Officer Thomas' trained police dog, Tyson, was also present in the Chevy Tahoe.

Officer Boaz's patrol car was positioned perpendicular to I-70 such that if he entered the flow of traffic in a forward direction it would be into the eastbound lanes. Officer Thomas' adjacent vehicle faced northbound.

Sometime around 6:30 a.m. Officer Boaz observed a white two-door Lincoln passenger vehicle traveling eastbound behind a semi-truck in the left lane. There was no intervening traffic traveling between Officer Boaz's vehicle and the vehicles in the left "fast lane." The white Lincoln was about two car lengths behind the semi. The two vehicles were traveling around 70 miles per hour, which is within the legal speed limit for that part of I-70. However, Officer Boaz testified that distance was too close to be safe in violation of Mo. Rev. Stat. § 304.017. Officer Boaz testified that he had no advance information or tips regarding the white Lincoln, which is defendant's vehicle, or any information about defendant when he saw the Lincoln drive past him.

Officer Boaz entered traffic and followed the Lincoln. He observed the Lincoln move into the slow lane behind the semi and continue to travel too closely to it. He activated his lights and both vehicles moved to the shoulder of I-70. He testified that the purpose of such stops is two-fold. First, it creates traffic awareness to reduce accidents. Second, Officer Boaz can contact drivers to identify any criminal activity that might be afoot. Officer Boaz explained that the stop was based on his observation of the traffic violation and he routinely conducts traffic

3

stops for this violation. On cross examination, Officer Boaz could not state how many feet the Lincoln traveled behind the semi.

After both vehicles pulled over to the shoulder, Officer Boaz approached the Lincoln on its passenger side and saw the driver, co-defendant Drew Tucker, and a front-seat passenger, who was the defendant Leonard Dale Van Dam. Both the driver and passenger rolled down their car windows. Officer Boaz observed a large unleashed dog in the rear passenger area. He thought the dog looked like a pit bull. On cross examination, Officer Boaz testified that the dog showed signs of aggression and defendant attempted to keep the dog from moving toward the front passenger window. Defendant also appeared nervous to Officer Boaz because defendant was pressed back against the front passenger seat.

Officer Boaz requested the driver's license for both men and also the vehicle's registration. Officer Boaz observed that defendant's license was issued from the State of Utah and the Lincoln was registered to him in Utah. The driver, co-defendant Tucker, had a photo identification but Officer Boaz could not recall if it was a driver's license at the time of his testimony. Officer Boaz asked co-defendant Tucker to exit the vehicle and to sit in the front seat of his patrol car for safety and to separate the two passengers. Officer Boaz testified that he did not like to talk to a vehicle's occupants through a car window with a dog inside it. Officer Boaz also wanted to talk to co-defendant Tucker while he conducted a records check. Officer Boaz testified that he routinely separates vehicle occupants to prevent their possible conversation to match accounts of their travels or to prevent an attack on the police. On cross examination, Officer Boaz testified that he did not see any contraband in plain view when he made first contact with the vehicle's occupants, nor did he smell any marijuana.

Officer Boaz testified that Officer Thomas arrived on the scene about one to two minutes later.  He saw Officer Thomas walk directly to defendant's vehicle, without Tyson, and approach the passenger side of the Lincoln where he made contact with defendant.  Officer Thomas asked defendant about the various fishing poles in the backseat area with the dog.  Officer Thomas thought the placement of the fishing poles was odd because they were blocking the rear window and, given that the car was registered out-of-state, he thought it would be inconvenient for a driver going such a distance to drive with an obstructed view out his rear view mirror.

Officer Thomas noted that defendant's responses to his questions were short and his hands were shaking.  Defendant had a noticeable pulse in his neck and he avoided eye contact.  Officer Thomas asked defendant about his travel plans.  Defendant stated that he was on a fishing trip.  Defendant said he drove from Utah but would not state where he was going.  Defendant said that he planned to return to Salt Lake City the following day.  Defendant had not fished and did not think he had time to do so before returning to Utah.  Officer Thomas noticed the odor of marijuana coming from the vehicle.  Officer Thomas testified that he asked defendant a question about how he knew co-defendant Tucker.  When defendant declined to answer, Officer Thomas waited for Officer Boaz to approach him with the results of the records check for the Lincoln and the occupants.

While Officer Thomas talked to defendant, Officer Boaz testified that co-defendant Tucker sat un-handcuffed in the front seat of his patrol car while he conducted a records check.[3]  When asked about the purpose of his travel co-defendant Tucker told him that he and defendant were traveling to Florida for a one-week fishing trip.  When Officer Boaz asked what kind of fish and where in Florida they would fish, co-defendant Tucker provided no details about species of

---

[3] Traffic violation warnings were issued to co-defendant Tucker.

fish or a location where this fishing would occur.  Officer Boaz took note of the fact that he thought such a cross-country trip would require some planning and would include these details when asked.

Officers Boaz and Thomas testified that shortly thereafter they compared the statements made by the two men roadside, and they determined that the accounts of the travel did not match. Given the estimated distance of more than 1,500 miles between Utah and Florida, and because Officer Boaz determined that the accounts given by co-defendant Tucker and defendant revealed a major discrepancy—plus Officer Thomas smelled marijuana—his suspicions were aroused and he asked Officer Thomas to deploy the canine Tyson for a free air sniff around the vehicle.

Officer Thomas asked defendant to exit the Lincoln with his dog and move away from the car.  Defendant had no leash for the dog, so Officer Thomas provided one to him.  Officer Thomas routinely keeps additional leashes in his vehicle because it is his experience that drug smugglers used the tactic of traveling with unleashed dogs.

Officer Thomas is an experienced dog handler.  His canine partner, Tyson, was certified by both the North American Police Work Dog Association and the National Narcotic Detector Dog Association as of May 18, 2015.  Officer Thomas testified that he has worked as a St. Charles County, Missouri police officer for approximately three and one half years, including when his agency was formerly called the St. Charles County Sheriff's Department.  Prior to his current employment, Officer Thomas worked for the Franklin County, Missouri Sheriff's Department for four years.  Officer Thomas is a sworn DEA Task Force Officer in St. Louis.

Officer Thomas described his canine partner Tyson's training to include a six week training class in Pennsylvania that the two attended in August through October 2014.  Officer Thomas and Tyson also train together regularly through the police department on a twice

monthly basis.  Tyson's police department requires that he is re-certified by a nationally recognized organization, which Officer Thomas has facilitated.

Tyson is a full service police dog that is trained to track, apprehend, detect narcotics, and search a variety of spaces.  He is trained to detect marijuana, cocaine, heroin and methamphetamine, specifically.  The government offered Tyson's certifications and some of his training records as exhibits.   See Gov't Ex. 3.  Tyson is trained to work in stressful situations of heavy traffic, loud noises, and around other dogs.  Officer Thomas has observed that Tyson has no difficulty reacting to the presence of other animals so long as they are sufficiently distant from him while he works, which was the purpose of having defendant stand away from his car with the pit bull.

Officer Thomas testified that he oversaw Tyson's actions on May 18, 2015 by using the same specific procedure he has used dozens of times.  Tyson started in a seated position at the front of the Lincoln as an anchor point.  While Tyson was leashed, the two walked backwards in a counterclockwise fashion.  Officer Thomas watched for an "indication" of contraband by Tyson.  Officer Thomas distinguished between the concepts of an "alert" versus an "indication." An alert is any significant behavior change in Tyson, which might lead to an indication.  In this case, Officer Thomas observed a change in Tyson's breathing pattern and "hunt speed," which is the movement of his head or entire body, as they moved around the Lincoln toward the trunk.

Officer Thomas explained that Tyson makes passive indications, which is to say that the canine is trained to sit or move into a "down position" to communicate his indication.  Tyson did so at the Lincoln's passenger door near the wheel well.  Officer Thomas told Officer Boaz the results of the free air sniff.

Thereafter, Officer Boaz told defendant that he had probable cause to search defendant's vehicle.  Defendant disagreed with him and objected to the search.  The search proceeded roadside.  Officer Boaz found a small black zipper pouch on the driver's side floorboard that contained a jar of suspected marijuana cigarettes and other items of evidence.  Officers found suspected black tar heroin in the center console, and suspected methamphetamine inside a false compartment of an Arizona Tea can inside a small computer bag in the trunk of the vehicle.

Defendant and co-defendant Tucker were then arrested at the scene and searched.  Officer Boaz arranged for defendant's Lincoln to be towed for a second search at a tow yard.  The second search yielded suspected methamphetamine found in a small suitcase that also contained dog toys.

## DISCUSSION

### Void-for-Vagueness Doctrine

Officer Boaz testified that he conducted a traffic stop of defendant's Lincoln for traveling too closely behind a semi-truck on I-70.  Defendant contends that the traffic stop of his Lincoln two-door sedan was not based on probable cause because Officer Boaz could not see a Missouri traffic violation from his vantage and, even if he could see such a violation, the traffic law applied in this case is unconstitutionally vague on its face.  (Doc. 71, Def. Amed. Mot., pp. 4-5.) Simply put: defendant claims that the terms of the statute are so vague that an ordinary person must guess at its meaning and cannot understand what conduct is prohibited.

Mo. Rev. Stat. § 304.017 provides in part:

The driver of a vehicle shall not follow another vehicle more closely than is reasonably safe and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the roadway.

Id.

As written, RSMo Section 304.017 creates a statutory duty that is prescribed in general terms. J.H. Cooper, Annotation, *Driver's Failure To Maintain Proper Distance From Motor Vehicle Ahead*, 85 A.L.R.2d 613 (Originally published in 1962) ("The standard embodied in such statutes seems to be but a statutory restatement of the common-law rule of ordinary care and, of course, demands that each case be decided upon all of its particular facts."). "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." Maynard v. Cartwright, 486 U.S. 356, 361, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988).

The parties do not present any Eighth Circuit cases about this particular Missouri law or any Missouri cases that address a void-for-vagueness challenge to RSMo Section 304.017. Likewise, this court is not aware of any such cases. "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." Kolender v. Lawson, 461 U.S. 352, 356 (1983). (Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). "[S]tate courts are the ultimate expositors of state law." United States v. Adler, 590 F.3d 581, 584 (8th Cir. 2009) (rejecting a criminal defendant's interpretation of a Nebraska turn-signal law and void-for-vagueness claim after a traffic stop); quoting Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)). The Missouri Supreme Court has, however, addressed the challenged traffic law in the context of a civil negligence action. Binion v. Armentrout, 333 S.W.2d 87 (Mo. 1960) (holding that Section 304.017 was "enacted for the protection of every person or vehicle which would reasonably be afforded a measure of protection by the enforcement of the terms thereof" in a case involving a plaintiff who was hit while on the side of a road after defendant's vehicle stuck another car). Beyond this

limiting construction, the government argues that the Missouri Department of Revenue publishes a *Drivers Guide* that recommends that drivers on Missouri roadways generally stay a distance of three seconds behind other vehicles; and, specifically, warns drivers to not follow a semi-truck in its "no zone," as safety measures.

Because the Missouri Supreme Court has suggested that RSMo Section 304.017 was designed to protect public safety, and it is to be applied equally to all persons on Missouri roadways, it cannot be said to suffer from the constitutional infirmities the U.S. Supreme Court observed in California's loitering law which was the subject of <u>Kolender v. Lawson</u>, 461 U.S. at 353 (noting that the "stop and identify" aspect of the loitering law passed constitutional muster but not the "credible and reliable" identification requirement), and which is cited by defendant. The <u>Kolender v. Lawson</u> Court ruled that California's loitering law was "unconstitutionally vague within the meaning of the Due Process clause of the Fourteenth Amendment by failing to clarify what was contemplated by the requirement that a suspect provide "credible and reliable" identification after a street stop occurred. <u>Id.</u> at 354-355. This was so because the "more important aspect of the vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to government law enforcement." <u>Id.</u> at 357. California's loitering law failed to furnish minimal standards and gave unrestrained authority to the police to define who was suspicious, and to stop those individuals on the streets without probable cause. Moreover, the Court considered the potential infringement on First Amendment liberties in its review of the loitering law, and expressed concern that the California law implicated the constitutional right to freedom of movement. By contrast, Missouri has a compelling governmental interest in reducing vehicular accidents. Such public safety objectives are met when an officer stops and

warns a Missouri highway driver about following a semi on a busy stretch of I-70 at two car lengths while traveling at around 70 miles per hour.

As applied, RSMo Section 304.017 is not so vague that an ordinary person must guess at its meaning, nor does it lend itself to arbitrary enforcement. See United States v. Bewig, 354 F.3d 731, 737 (8th Cir. 2003). The statute directs drivers to be prudent and consider speed, the volume of traffic, and roadway conditions in making judgments about driving in proximity to other vehicles for the protection of public safety. As stated above, the government argues that Missouri has issued guidance that is widely available through the state's Department of Revenue that recommends that drivers time their distance from other vehicles and to keep away from a truck's "no" zones.[4] Further, Officer Boaz testified that he estimated the semi and the Lincoln to be traveling at 70 miles per hour and the distance between vehicles was too close to be safe, which was objectively reasonable in light of what he saw and his training and vast experience. Law enforcement officers are not expected to "interpret the traffic laws with the subtlety and expertise of a criminal defense attorney," United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) (quoting United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999)). The determination of objective reasonableness "is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005). If an officer makes a mistake in law or fact, the mistake "must be objectively reasonable to avoid running afoul of the Fourth Amendment." Martin, 411 F.3d at 1001. Therefore, RSMo Section 304.017 does not impermissibly delegate policy matters to the police for resolution on an ad hoc and subjective basis. Grayned v. City of Rockford, 92 S.Ct. 2294, 2298-99 (1972).

---

[4] The government's witnesses did not testify about the Missouri Department of Revenue guidance, nor did the government offer the *Driver's Guide* into evidence.

Moreover, defendant's argument that Officer Boaz could not determine an exact distance or see the traffic violation does not lend itself to a finding that RSMo Section 304.017 is vague, given Officer Boaz' testimony about his training, experience and sight line of the passing vehicles. "As this Court has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." United States v. Williams, 553 U.S. 285, 306 (2008).

Inasmuch as defendant also argues that Officer Boaz made an unreasonable mistake of law by enforcing an invalid statute, this argument is unavailing. See United States v. Washington, 455 F.3d 824, 827 (8th Cir. 2006) ("In our circuit, if an officer makes a traffic stop based on a mistake of law, the legal determination of whether probable cause or reasonable suspicion existed for the stop is judged by whether the mistake of law was an 'objectively reasonable one.'" (quoting Smart, 393 F.3d at 770)). In addition, in Heien v. North Carolina, 135 S.Ct. 530 (2014), the Supreme Court held that evidence seized following a traffic stop of a vehicle should not be suppressed even though the police officer did make a mistake of law regarding whether there had actually been a traffic violation. "Here, … the mistake of law relates to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the Fourth Amendment in the first place." Id. at 539. In Heien the officer made the stop because one of the defendant's brake lights was out, but the state law requiring "a stop lamp" was later determined to require only one brake light, not two. The Court ruled that this was a reasonable mistake of law and that the evidence seized should not be suppressed. The Court noted that the state law was not clear and had never previously been construed by the state appellate courts, and that it was objectively reasonable for the officer to believe two brake lights were required. Likewise, Officer Boaz's

actions were objectively reasonable in reliance on RSMo Section 304.017. Therefore, these points should be denied.

### The Traffic Stop And Police Inquiries

"A traffic stop is considered a seizure for Fourth Amendment purposes." <u>United States v. Guevara</u>, 731 F.3d 824, 827 (8th Cir. 2013). In order to justify the seizure, the stop must be "supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred," and the police must "objectively ha[ve] a reasonable basis for believing that the driver has breached a traffic law." <u>United States v. Washington</u>, 455 F.3d 824, 826 (8th Cir. 2006). The Eighth Circuit has repeatedly held that "[a] traffic violation—however minor— creates probable cause to stop the driver of a vehicle." <u>United States v. Wright</u>, 512 F.3d 466, 471 (8th Cir. 2008) (quoting <u>United States v. Bloomfield</u>, 40 F.3d 910, 915 (8th Cir. 1994) (en banc)). <u>United States v. Fuse</u>, 391 F.3d 924, 927 (8th Cir. 2004). A passenger has standing to challenge a traffic stop's constitutionality. <u>Brendlin v. California</u>, 551 U.S. 249, 256–259 (2007). The government bears the burden of establishing that probable cause existed. <u>United States v. Andrews</u>, 454 F.3d 919, 922 (8th Cir. 2006).

Officer Boaz observed defendant's Lincoln following the semi too closely and, for this reason, he had probable cause to initiate a traffic stop. <u>United States v. Brown</u>, 345 F.3d 574, 578–80 (8th Cir. 2003); <u>United States v. Linkous</u>, 285 F.3d 716, 719–20 (8th Cir. 2002). Once he made the traffic stop, he was authorized to check the driver's license and the vehicle's registration, conduct computer searches relating to criminal history, make inquiries about the trip and its purpose, and detain defendants as long as reasonably necessary to conduct these activities and to issue a warning or citation. <u>United States v. Quintana</u>, 623 F.3d 1237, 1239 (8th Cir. 2010) (quoting <u>United States v. Jones</u>, 269 F.3d 919, 924–25 (8th Cir. 2001)). Factors such as

conflicting stories given by a driver and a passenger may justify expanding the scope of the traffic stop and further detention of the vehicle's occupants. Such was the case here. Neither the driver nor the passenger had Missouri-issued license information which may have reasonably required officers more time to obtain necessary records; and the traffic violations observed by Officer Boaz resulted in the issuance of several warnings. Therefore, his decision to conduct the traffic stop was reasonable under the circumstances, the stop was of reasonable length and it was based on probable cause.

**Detention Of Defendant's Vehicle To Conduct A Drug-Detection Dog Sniff**

Defendant argues that these officers improperly delayed his travels on a mere hunch, and they did not have a sufficient factual basis to support a reasonable suspicion of wrongdoing to deploy a drug-detection dog.

An investigative <u>Terry</u>-type stop is proper if a police officer "has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." <u>United States v. Vinson</u>, Slip Op. Case No. 15-1363 (8th Cir. Nov. 18, 2015) (quoting <u>United States v. Roberts</u>, 787 F.3d 1204, 1209 (8th Cir. 2015) (internal quotation marks omitted)). The officer need only "articulate some minimal, objective justification for an investigatory stop" in order to comply with the Fourth Amendment. <u>United States v. Fuse</u>, 391 F.3d 924, 929 (8th Cir. 2004) (citing <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)).

Specifically, Officer Thomas smelled marijuana inside defendant's car and observed his nervousness, a pulsing vein in his neck, and lack of eye contact. Officers Thomas and Boaz also considered the occupants' statements about their fishing trip to be contradictory. They considered the occupants' dueling accounts of the arguably implausible travel itinerary of a multi-state fishing trip to Florida by way of Missouri with plans to return to Utah the next day; or

a week-long trip to Florida that lacked detail about the type or location of such fishing. All of this created a sufficient basis to expand the scope of the stop because defendant may have been transporting drugs. On similar facts, the Eighth Circuit has decided, "[a]fter defendant gave noticeably irregular denials to questions involving methamphetamine and marijuana, [officer]'s suspicions were strengthened rather than alleviated." See United States v. Donnelly, 475 F.3d 946, 952 (8th Cir. 2007). See United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993) ("[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions."). Any "subsequent questions represented a minimally intrusive way of addressing his reasonable suspicion; asking them did not, therefore, constitute an unreasonably prolonged detention." Donnelly, 475 F.3d at 953.

Because Officer Thomas smelled the odor of marijuana and observed defendant's nervousness, along with the conflicting statements made about the road trip, this case does not implicate the Supreme Court's ruling in Rodriguez v. United States, --- U.S. ----, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). In Rodriguez, the Supreme Court resolved a split among lower courts and reversed longstanding Eighth Circuit precedent that allowed the police to extend a stop and conduct dog sniffs without additional reasonable suspicion so long as it was a short delay and, therefore, a *de minimus* intrusion on a defendant's personal liberty. Id. at 1616. The Court clarified that a police extension of a traffic stop in order to conduct a dog sniff was not constitutionally permissible unless the police had reasonable suspicion to do so. Here, Officers Boaz and Thomas had reasonable suspicion in light of the responses and behavior of the two occupants of defendant's Lincoln. Defendant had shaking hands. He avoided eye contact and he had a vein in his neck with a visible pulse. Officer Thomas testified that he smelled the faint

odor of marijuana while speaking with defendant.  Accordingly, the officers possessed the reasonable suspicion necessary to justify the deployment of the canine unit to sniff around the vehicle, which was done right away because the canine unit was already on the scene.

**Drug-Detection Dog's Indication of Drugs and Probable Cause To Search Defendant's Vehicle**

### A.  The reliability of canine Tyson's indication

Defendant contends that Tyson was stressed by his physical proximity to the highway and confused by the scent of defendant's dog that was riding in the backseat of the Lincoln until shortly before the free air sniff.  Thus, he argued, Tyson's indication was unreliable.  These arguments are speculative and are not supported by the record.

Officer Thomas testified to Tyson's training regime and certifications.  He described Tyson's indication on the Lincoln as reliable and consistent with Tyson's training and experience to recognize the odor of narcotics.  Moreover, the government offered into evidence Tyson's certifications and some of his training records as exhibits, which were given to defendant.  Defendant has not challenged Tyson's performance record or certifications.  Rather, the training records support the witness's testimony that there was sufficient reason for Officer Thomas as his handler to trust Tyson's alerts and his indication of narcotics odor.

The Supreme Court has refined the dog sniff's reliability test.  See generally Florida v. Harris, ⸺ U.S. ⸺, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013).  A dog's training and certification to detect drugs provides "facial validity" in his reliability.  Id.

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral

argument. See Tr. of Oral Arg. 23–24 ("[T]he defendant can ask the handler, if the handler is on the stand, about field performance, and then the court can give that answer whatever weight is appropriate").  And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

….

The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

Id. at 1057-58.  The Court rejected the notion that the government must introduce field-performance records to establish that a dog's alert provided probable cause, id. at 1056, concluding instead that "a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  Id. at 1057.  Although acknowledging that a drug dog's performance in the field "may sometimes be relevant," id. at 1057, the Court expressed doubt about the significance of field performance records.

Here, Officer Thomas testified that there were no conditions present on May 18, 2015 during the traffic stop that were unfamiliar to Tyson, including the presence of a female dog and roadway noise.  The canine's ongoing training is regular and consistent.  He has been examined and considered competent by independent evaluators, with proper certifications, and Tyson is trained to identify numerous narcotic odors.  There is no evidence that Officer Thomas cued the dog or even that Tyson expected a reward upon the indication.  Therefore, the facts of this case meet the Supreme Court's probable cause test of a dog's reliability established in Florida v. Harris.

An "indication by a properly trained and reliable drug dog provides probable cause for ... the search of a vehicle."  United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010).  Assuming

that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present. United States v. Alexander, 448 F.3d 1014, 1017 (8th Cir. 2006); United States v. Sundby, 186 F.3d 873, 875–76 (8th Cir. 1999). Accordingly, Officers Boaz and Thomas had probable cause to search defendant's car pursuant to the automobile exception to the warrant requirement.

### B. Observations By Officer Thomas

As discussed above, Officer Thomas testified that he smelled the odor of marijuana inside the Lincoln when he first spoke with the defendant at the car. The Supreme Court has recognized that the odor of an illegal drug can be highly probative in establishing probable cause for a search. United States v. Caves, 890 F.2d 87, 90 (8th Cir. 1989), citing Johnson v. United States, 333 U.S. 10, 13 (1948) (observing that the odor of an illegal substance testified to by a qualified affiant "might very well be found to be evidence of a most persuasive character"). Many lower courts have relied primarily on the odor of marijuana in determining that probable cause existed for a warrantless automobile search. See, e.g., United States v. Loucks, 806 F.2d 208 (10th Cir. 1986) (probable cause existed after automobile was stopped for speeding, driver was "reeking" of marijuana as he sat in patrol car, and officer smelled what he thought was still-burning marijuana in the detained vehicle); United States v. Haley, 669 F.2d 201 (4th Cir. 1982) (patrolman had probable cause after he stopped speeding automobile, smelled intense odor of marijuana emanating from driver's body while he sat in police cruiser, and also smelled strong marijuana odor when passenger rolled down window of the stopped vehicle). These facts also established the basis for the probable cause to search the vehicle.

**The Search of Defendant's Lincoln**

Under the automobile exception to the warrant requirement, an officer with probable cause to search a vehicle may search any item within that vehicle that is capable of containing the object of the search, regardless of whether the item belongs to the driver, passenger, or someone else.  Wyoming v. Houghton, 526 U.S. 295, 307 (1999).  "If probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  United States v. Ross, 456 U.S. 798, 825 (1982).  See also United States v. Brown, 634 F.3d 435 (8th Cir. 2010).

The Eighth Circuit has noted that the "automobile exception" permits the warrantless search of a vehicle if the police "had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began."  United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).  If the automobile exception applies, the vehicle need not be searched immediately.  United States v. Castaneda, 438 F.3d 891, 894 (8th Cir. 2006).  "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005).  In making the probable-cause determination, we "apply a common sense approach and consider all relevant circumstances."  Id.

Officers Boaz and Thomas had probable cause to search defendant's Lincoln.  Officer Thomas testified that he smelled the odor of marijuana in the vehicle and Tyson indicated that the odor of narcotics was present.  Accordingly, officers did not need a warrant to search the vehicle.

**Defendant's Arrest**

The Eighth Circuit has ruled that whether officers make a formal arrest or a detention ripens into an arrest, "[a] warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." Guevara, 731 F.3d at 832; quoting Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting Borgman v. Kedley, 646 F.3d 518, 522–23 (8th Cir. 2011)); see also Martinez, 462 F.3d at 907, 910 (holding in the alternative that even if handcuffing a suspect did convert the detention into an arrest, the arrest was justified by probable cause). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.' " Ulrich, 715 F.3d at 1059 (quoting Borgman, 646 F.3d at 523).

Officers Boaz and Thomas had probable cause to arrest defendant based on the totality of the circumstances. Therefore, his arrest was valid.

**Defendant's Motion For The Production Of The Defendant's Prior Record, Documents And/Or Objects Books, Papers, Tangible Objects and Reports, Within The Gov'ts Possession, Custody Or Control Pursuant To F.R.Cr.P. 16(D),(E)(i)(ii), (F)(i)(ii)(iii) (Doc. 91); and Motion For The Production Of Discovery Pursuant To F.R.Cr.P. 16(a)(1)(A) (Doc. 107).**

To the extent that defendant's two motions seek disclosure of any material and information required to be disclosed to him by the government pursuant to Rule 16, Federal Rules of Criminal Procedure, the motions should be granted. Brady v. Maryland, 373 U.S. 83 (1963). This includes evidence which may be used to impeach the testimony of government witnesses. United States v. Bagley, 473 U.S. 667 (1985).

Therefore, defendant's motion is granted, and the government shall provide to defendant the following material or information, if any exists, as to any person who it calls as a witness at trial in this case including:

1.      The prior criminal history of convictions of the witness;

2.      Any consideration offered or given to the witness in exchange for his/her testimony and/or cooperation in the investigation of the case; and

3.      Any statement of the witness which relates to the subject matter about which he/she is to testify (Jencks Act Material).  Defendant's motions should be denied in all other respects.

**Defendant's Motion For Notice In A Criminal Case Pusuant To F.R.E. 404(b)** (Doc. 92)

Rule 404(b) of the Federal Rules of Evidence states in part that "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial or during trial if the court excuses the pretrial notice on good cause of the general nature of any such evidence it intends to introduce at trial."  Rule 404(b), Federal Rules of Evidence.  Because defendant has requested this information, the government must provide to defendant the general nature of any evidence it intends to attempt to introduce under Rule 404(b).

To the extent that defendant also seeks an order excluding any such Rule 404(b) evidence that the government might proffer at trial, no such evidence was proffered by the government before the undersigned.  Therefore, defendant's motion to exclude such evidence at trial is premature and it is denied without prejudice.  Defendant may choose to raise this issue again prior to the commencement of his trial.

**Defendant's Motion To Subpoena Witness For Suppression Hearing Scheduled For 10-23-2015 and Petition For Appointment And Furnishment Of An Investigator and Expert Witnesses Pursuant to Title 18 USC § 3006A (Doc. 80); (Doc. 111)**

On the afternoon of Thursday, October 22, 2015, the court received defendant's *pro se* motion to subpoena co-defendant Tucker to appear at defendant's evidentiary hearing, which was set for Friday, October 23, 2015. Defendant mailed the Motion to the wrong court, which was the Missouri 22nd Judicial Circuit Court in St. Louis City. The Circuit Court received defendant's motion on October 19, 2015. The motion was thereafter re-routed to the federal courthouse in this district. The motion stated that co-defendant Tucker has knowledge relevant to the facts to be raised at the evidentiary hearing, and cites to "Rule 12" in support of his right to raise any defense. The court denied defendant's request for co-defendant's appearance at the evidentiary hearing for the reasons stated below.[5] Because this Motion and Petition ask for defense witnesses at these proceedings, the undersigned will address these arguments together only the extent that these may be construed as pretrial motions because it is not clear whether

---

[5] Government's counsel arranged for co-defendant Tucker to be brought to the courthouse on Friday, October 23, 2015 and for co-defendant Tucker's lawyer, Patrick Kilgore, to be present in the courtroom. The undersigned directed that co-defendant Tucker not be brought to the courtroom, however, because he was unaware of the reason for his presence in the courthouse and he had yet to meet with his own lawyer about the matter by the time the evidentiary hearing began. Moreover, co-defendant Tucker had not entered a guilty plea before October 23, 2015 and had not yet waived his Fifth Amendment rights. The parties stated that co-defendant Tucker was not counseled about the significance of the subpoena, nor did defendant indicate that he had any information that co-defendant Tucker desired to testify on his behalf. Government's counsel noted that it would be Mr. Kilgore's advice that co-defendant Tucker not waive his Fifth Amendment right to silence and that he not testify and at the evidentiary hearing. Also relevant, the undersigned was aware that co-defendant Tucker, who had complained about ongoing medical issues and the representation of his counsel, was scheduled for a hearing before District Judge E. Richard Webber on October 27, 2015. Thus, it was unclear whether co-defendant Tucker intended to continue with Mr. Kilgore as his attorney. Given these facts, and the inadequate time for co-defendant Tucker to make an informed decision about testifying, and the lack of an adequate proffer by defendant to establish that his co-defendant's testimony was material or would be favorable to the pretrial issues he raised, his motion was denied from the bench. Defendant did, however, exercise his right to cross examine the government's witnesses as discussed above. <u>Hawkins</u>, 796 F.3d at 863.

defendant intends that his Petition be addressed as a trial motion or whether it is filed in an effort to re-litigate the pretrial matters he raised previously. The government had not filed a response to defendant's Petition at the time of the court's writing.

Rule 17(b) of the Federal Rules of Criminal Procedure provides for motions to subpoena various expert and fact witnesses in criminal cases. The Eighth Circuit has noted that this right is not without bounds. "As we have previously noted, '[t]he right to compulsory process is not absolute. Both the Sixth Amendment compulsory process and the Fifth Amendment due process clauses require that a defendant show that the witness 'testimony would have been both material and favorable to his defense.'" United States v. Hawkins, 796 F.3d 843 (8th Cir. 2015); quoting United States v. Luvene, 245 F.3d 651, 654 (8th Cir. 2001) (quoting United States v. Valenzuela–Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). United States v. Hang, 75 F.3d 1275, 1282 (8th Cir. 1996) ("The burden is upon [the party requesting a Rule 17(b) subpoena] to show that the desired witnesses are necessary to an adequate defense."). Defendant's Petition provides no specifics about which experts he seeks or for what purpose. Likewise, he fails to state why he needs an investigator at this juncture after asking to proceed *pro se* and being advised by the court of the potential pitfalls of self-representation. Therefore, defendant's Petition should be denied without prejudice subject to his reasserting it at trial.

### Defendant's Oral Motion For *In Camera* Review of Co-defendant Drew Tucker's Sealed Correspondence To The Court

At the close of the evidentiary hearing, defendant made an oral motion that the undersigned review co-defendant Tucker's letters addressed to the court to determine whether co-defendant Tucker made reference to defendant and whether such reference, if any, did exculpate defendant. Counsel for the government proffered that she had already read the letters

and determined that there was nothing in the content of the letters that mentioned defendant. The court, nevertheless, granted defendant's oral motion.

The court has now re-read the two letters mailed to the court by co-defendant Tucker and which are now filed in this case. The letters are dated August 24. 2015 and September 25, 2015. The undersigned finds that no mention of defendant was made in either letter.[6] Moreover, as stated above, and as discussed at the hearing, the court has ordered the government to comply with its obligations under the Federal Rules of Criminal Procedure and the government has affirmed that it is aware of it continuing obligation to disclose any evidence favorable to defendant and which is material to the guilt or innocence of defendant. Brady, 373 U.S. 83 (1963).

Finally, on November 24, 2015, defendant filed a lengthy *pro se* post-hearing brief with exhibits. The government had not filed a response at the time of this writing. No such post-hearing briefs were ordered by the court. Still, defendant restates his arguments in support of his position that RSMo Section 304.017 is unconstitutionally vague. In summation, he contends that the initial criminal complaint affidavit against includes facts that are different than those in support of the current charges. If the government fails to prove at trial that defendant possessed with the intent to distribute 50 grams or more of methamphetamine, then defendant may be entitled to an acquittal; however, it is not grounds to dismiss the charges against him at this stage in the proceedings.

---

[6]  To the extent that defendant or stand-by counsel expressed concern at the evidentiary hearing that the government's counsel had copies of the sealed letters without a court order, there is no basis for such concern. Copies of co-defendant Tucker's letters, which were addressed to the court, were provided to the AUSA and co-defendant Tucker's defense counsel by the court upon their receipt in the U.S. mail. The letters were thereafter sealed at the court's direction.

## Conclusion

For all of the foregoing reasons, it is recommended that defendant's Amended Motion to Suppress Evidence should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Amended Motion To Suppress Evidence (Doc. 71) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that defendant's Petition For Appointment And Furnishment Of An Investigator and Expert Witnesses Pursuant to Title 18 USC § 3006A (Doc. 111) be **DENIED**.

**IT IS HEREBY ORDERED** that defendant's oral Motion To Withdraw defendant's Motion To Suppress Evidence (Doc. 55) is **GRANTED**; and Defendant's Motion to Suppress Evidence (Doc. 55) is **WITHDRAWN**.

**IT IS FURTHER ORDERED** that defendant's Motion To Subpoena Witness For the Suppression Hearing Scheduled for 10-23-2015 (Doc. 80) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's Motion For The Production Of The Defendant's Prior Record, Documents And/Or Objects Books, Papers, Tangible Objects and Reports, Within The Gov'ts Possession, Custody Or Control Pursuant To F.R.Cr.P. 16(D),(E)(i)(ii), (F)(i)(ii)(iii) (Doc. 91) is **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that defendant's Motion For Notice In A Criminal Case Pursuant To FRE 404(b) To Provide Notice Of The General Nature Of Any Evidence The Gov't Intends To Use At Trial (Doc. 92), is **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that defendant's Motion For The Production Of Discovery Pursuant To F.R.Cr.P. 16(a)(1)(A) (Doc. 107) is **GRANTED IN PART and DENIED IN PART**.

The parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in the waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

**IT IS FURTHER ORDERED** that this cause is set for trial before United States District Judge E. Richard Webber on **Tuesday, January 19, 2016 at 8:30 a.m.**


/s/Noelle C. Collins
United States Magistrate Judge


Dated this 4th day of December, 2015.